**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-20 (TNM)** |
| **v.** | : | |
| | : | |
| **SAUL LLAMAS,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Saul Llamas to 14 days' incarceration, 3 years' probation, and $500 in restitution.

### I.      Introduction

Defendant Saul Llamas, 30, is a police officer who participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Llamas pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 14 days' incarceration, 3 years' probation, and $500 restitution is appropriate in this case because Llamas (1) was a police officer with a hospital in Ohio and also worked part-time for a local police department in Ohio, (2) entered the Capitol without passing any kind of security, even though he was scanned by security at an entirely separate building shortly beforehand, and (3) entered the Senate Wing Door after observing people climbing through broken

1

windows and seeing the broken glass within the door. These three facts show that Llamas was particularly well-equipped to understand that he was not allowed to enter the Capitol that day. Moreover, during his post-arrest interview with the FBI, Llamas remembered minute details about the events of the day but could not recall potentially inculpatory statements made by his best friend, Ryan Swoope, who used chemical spray against a police officer on January 6.

The Court must also consider that Llamas' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Llamas' crime support a sentence of 14 days' incarceration, 3 years' probation, and $500 restitution in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense at 1-3.

### Defendant Llamas' Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Saul Llamas and his two codefendants, Jordan Siemers, and Ryan Swoope traveled to Washington, D.C., from their home in Ohio to attend President Trump's rally. After the rally, they walked to the Capitol with a large crowd of people. Along the way, they stopped to use the facilities in an unknown building, at which point they and their belongings were scanned by security. When Llamas arrived at the Capitol Grounds, he and the others used the staircase covered by the inaugural scaffolding to access the Upper Northwest Terrace. From there, he entered the Senate Wing Door with Siemers and Swoope at 3:08 p.m. Llamas saw that the glass

inside the door was broken by, in his words, "some yahoo" and later recalled knowing that Ashli Babbitt had been shot by the time he entered.



*Llamas (circled in red) entering the Senate Wing Door*

Once inside, Llamas and Siemers walked south towards the Crypt. Near the Senate Spouses' Lobby, Llamas spoke with a police officer who told him and Siemers that they were not supposed to be in the building. At this point, Llamas and Siemers walked back to the Senate Wing Door and left the Capitol. They were inside the building for nine minutes.

*Llamas' Post-Arrest Interview with the FBI*

On November 30, 2022, Llamas gave a voluntary post-arrest interview to the FBI. Llamas described how he had known Swoope since the third grade. He said that he lived with Siemers and Swoope. Turning to January 6, Llamas said that they went to the Capitol because President Trump directed people "to start walking" there. When talking about his path at the Capitol, Llamas drew the agents a map of the National Mall and the Capitol Grounds. He identified where the scaffolding and inaugural stage were located, noted the entrance with the broken glass door, and recalled which direction he took inside the Capitol. He also remembered where he had the conversation with the

police officer, that the topic of the conversation was about "everything going on," and that it was casual. When Llamas asked the officer if they should be in the Capitol, the officer responded "no, technically you're not supposed to be here."

Llamas said that they left the same way they came in and that they were in the Capitol for about 20 minutes. After leaving the Capitol, Llamas saw people fighting police and that there was a "stalemate" at an entrance to the building. Llamas also pointed to where he and Siemers sat for some time outside of the Capitol and noted where a cameraman stood nearby. He saw police vehicles outside the Capitol with people standing on them.

When questions related to Swoope came up, however, Llamas' memory became fuzzy. When asked if anyone had a backpack with them, Llamas remembered he had a small bag and that Siemers did not. However, Llamas could not remember if Swoope had a bag. Llamas described how he was separated from Swoope for some period of time and recalled how he later rejoined Swoope on some part of the Capitol Grounds. He could not, however, give a time frame for how long they had been separated. The FBI then asked if Swoope told Llamas anything about where Swoope went. Llamas only remembered Swoope saying that "he was in the crowd, and it got real crazy," but no details beyond that. When asked if he saw Swoope doing anything to anyone, Llamas pivoted to talking about Siemers. Llamas was again asked if Swoope said about what he was doing while they were separated, to which Llamas quickly replied "no" twice.

The interview then returned to whether Llamas or Swoope had a bag at the Capitol. Llamas reiterated that he brought a bag with him, and that Swoope "brought whatever he brought." In a follow up answer, Llamas said that he "can't recall" if Swoope had anything, but that "whatever that building is that we stopped to the bathroom, they checked us there." He emphasized that the security personnel were "wanding everybody, checking everybody."

When specifically asked if Swoope had pepper spray with him, Llamas's answers became non-verbal. After the interviewers relayed the allegations that Swoope pepper sprayed a police officer and asked if Swoope told him about his actions, Llamas said, "I don't, I do not, like, remember him saying anything about that." Later during the interview, on the topic of what Swoope did while separated from Llamas, Llamas recalled the conversation that he had with Swoope on the drive back to Ohio. Specifically, Llamas summarized the conversation as follows: "you know, we talked about the beginning, like, wow this was kind of crazy, this that, it was craziness in there. Uh, we talked about the somebody supposedly being shot. We talked about, just, some of the stuff, you know. But, uh, no, he did not mention anything as such." He then said, "because it's been a while, I, cannot recall."

This story changed, however, when one of the interviewers noted his doubt of how much Swoope told Llamas. At this point, Llamas replied, "like I said, I didn't, he didn't go into that detail. . . . He may have deliberately not told me something like that. I am a police officer. . . . Especially if he maced a police officer, that's the last thing he's going to want to tell me."

*The Charges and Plea Agreement*

On November 14, 2022, the United States charged Llamas by criminal complaint with violating 18 U.S.C. § 1752(a)(1)-(2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On November 30, 2022, law enforcement officers arrested him at his home in Ohio. On January 18, 2023, the grand jury returned an indictment charging Llamas with violating 18 U.S.C. § 1752(a)(1)-(2) and 40 U.S.C. § 5104(e)(2)(D) and (G). Pursuant to a plea agreement, Llamas pleaded guilty to Count Ten of the Indictment, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Llamas agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Llamas now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Llamas faces up to six months of imprisonment and a fine of up to $5,000. Llamas must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Incarceration as a Condition of Probation Under 18 U.S.C. § 3563(b)(10)

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation. 18 U.S.C. § 3653(b)(10). Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation. *Id.* Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the

defendant to serve up to six months in prison as a condition of probation. *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10). Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022)

7

(same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation). Imposing an intermittent confinement sentence with 14 days of imprisonment as a condition of probation is appropriate in this case.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days' incarceration, 3 years' probation, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Llamas' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Llamas, the absence of violent or destructive acts is not a mitigating factor. Had Llamas engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Llamas' case is how he ignored signs that he shouldn't be at the Capitol. At the time Llamas entered the Capitol through the Senate Wing Door, people on either side of him were climbing in and out of the Capitol through broken windows. There were nearly a dozen police officers, some in riot gear, to his left as well. Security footage and testimony in other January 6 trials shows that there was broken glass all over the ground, pieces of furniture were strewn across the floor, and an alarm rang throughout the entry area. *See e.g.*, Testimony of Lieutenant Scott Grossi, *United States v. Ballenger*, 1:21-cr-00719 (JEB), Trial Tr. 3/20/2023 at 78-79. He had passed through a full security check in a different building earlier that day, which would have only heightened his awareness that he entered the Capitol without undergoing any screening at all. Only after speaking to a police officer did Llamas decide that he should not be in the Capitol. Yet even then, he was in no rush to leave as it took him several minutes to make it the short distance to leave the Capitol.

When interviewed later about his activities on January 6, Llamas had a selective memory about what he did, what his friend Swoope did, what conversations he had, and what he talked about. For example, Llamas remembered in perfect detail the layout of the National Mall, the location of the inaugural stage, the entrance he used, the direction he took when he got inside, the response he heard from the police officer after Llamas asked if it was okay to be in the Capitol, where he and Siemers sat outside the Capitol, and the location of a cameraman that stood nearby them. However, when the topic of Swoope came up during the interview, Llamas could not remember many details. When asked directly about Swoope using pepper spray against a police officer, Llamas started to give non-verbal answers or pivoted to other topics. His answers indicate that despite his assertions to the contrary, he was less than forthcoming with the FBI.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days' incarceration, 3 years' probation, and $500 restitution in this matter.

**B.  Llamas' History and Characteristics**

At the time of the offense, Llamas was employed as a police officer at two different agencies in Ohio. PSR ⁋⁋ 45-46. Llamas' employment as a law enforcement officer indicates that he had or should have had knowledge and training in how to recognize a dangerous crowd-control situation, such as the riot on January 6, and he should have been able to recognize all the signs that his presence at the Capitol was not welcome. Despite that experience, Llamas continued onward into the Capitol.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is also a need to specifically deter Llamas from future conduct. This need comes from Llamas' employment as a police officer. As a law enforcement officer, Llamas should know that the law applies to everyone equally. On January 6, however, Llamas decided that the law did not apply to him. He must be deterred from making the same decision in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence Llamas based on his own conduct and relevant characteristics, but should

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Llamas pleaded guilty to Count Ten of the Indictment, charging him with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity

among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

13

It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Comparing Llamas with his co-defendant convicted of the same offense (Siemers), the two cases share many characteristics (such as the many indicators and very recent experience with security screening that should have told Llamas and Siemers not to enter), but Llamas's sentence should be greater than Siemens. This is because Llamas's position as a police officer means that his offense was an abuse of public trust, his work as an officer would have equipped him even more than the average person to understand the nature of the riot occurring on January 6 – and yet, he set that knowledge aside to enter the building. Further, Llamas was not forthcoming with the FBI.

In *United States v. Tam Pham*, 21-cr-109 (TJK), the defendant spent 20 minutes in the Capitol. Upon entry, he chanted "we are taking the House back." He then made his way to the office suite of House Minority Leader Kevin McCarthy. At the time of the riot, Pham had been a police officer in Houston, Texas for 18 years. After January 6, Pham lied to the FBI when he said that he only wanted to go into the Capitol to take pictures of art. For his plea to violating 40 U.S.C. § 5104(e)(2)(G), the court sentenced Pham to 45 days' incarceration.

In *United States v. Brandon Prenzlin*, 21-cr-694 (TNM), Prenzlin entered the Capitol despite knowing that he should not have been there. As here, this knowledge came both from the presence of barriers and police officers as well as the chaos of the day. When interviewed by the FBI, Prenzlin lied to the FBI by first stating that he did not go into the Capitol. After conceding he

did go inside, Prenzlin continued to minimize his conduct during the interview. This Court sentenced Prenzlin to 10 months' probation, $2,500 fine, and 120 hours' community service. Prenzlin, however, was not a police officer, and did not, to the government's knowledge, have the experience of going through security screening in a different building that very same day.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.[2]

---

[2] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea

---

(D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Llamas must pay $500 in restitution, which reflects in part the role Llamas played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Llamas' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days' incarceration, 3 years' probation, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Andrew Haag*
Andrew S. Haag
Assistant United States Attorney
MA Bar No. 705425
601 D Street N.W.
Washington, D.C. 20530

## CERTIFICATE OF SERVICE

On this 5th day of September 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 s/ *Andrew Haag*
Andrew S. Haag
Assistant United States Attorney